## UNITED STATES

### v.

### Leonard E. BRISCOE, Lance H. Wilson, and Maurice David Steier.

### Crim. Nos. 91–399 SSH, 92–86 SSH.

United States District Court, District of Columbia.

Dec. 1, 1992.

Roscoe C. Howard, Jr., George Ellard, Dianne Jean Smith, Office of Independent Counsel, Asst. U.S. Atty. Daniel Gelber (USAO, SD/FL), Washington, DC, for plaintiff.

Barry W. Levine, Elaine Metlin, Dickstein, Shapiro & Morin, Washington, DC, for Briscoe.

Martha Rogers, Cadwalader, Wickersham & Taft, Washington, DC, Theodore V. Wells, Jr., Lowenstein, Sandler, Kohl Fisher & Boylan, Roseland, NJ, for Wilson.

James M. Davis, Omaha, NE, for Steier.

### *RULE 42(a) ORDER OF CONTEMPT*

STANLEY 'S. HARRIS, District Judge.

In conformity with Fed.R.Crim.P. 42(a), the undersigned hereby certifies that the conduct of Barry M. Levine, counsel for defendant Briscoe, as is set forth partially below, was committed in the actual presence of the Court and was seen or heard by the Court during the trial of this case, which began on September 29, 1992, and, as of the date of this Order, is still proceeding. Such conduct constituted criminal contempt.

The Court recognizes that summary disposition under Rule 42(a) is an extraordinary power that must be reserved for "exceptional circumstances." *Harris v. United States,* 382 U.S. 162, 164–166, 86 S.Ct. 352, 354–55, 15 L.Ed.2d 240 (1965). A court may invoke Rule 42(a) only when there has been an "actual obstruction of justice." *In re McConnell,* 370 U.S. 230, 233, 82 S.Ct.

1288, 1291, 8 L.Ed.2d 434 (1962). Moreover, there must be a compelling need for an immediate remedy or time must be of the essence. *United States v. Lowery*, 733 F.2d 441, 447 (7th Cir.1984) (citing *United States v. Mochiano*, 695 F.2d 236, 251 (7th Cir. 1982)). The Court had hoped that such an extraordinary sanction could be avoided in this case. Reluctantly, however, the Court found that despite its repeated attempts to persuade Mr. Levine to comply with its rulings, it had no option but to hold Mr. Levine in contempt.[1]

■ As set forth below, Mr. Levine continually defied the Court's explicit and direct orders. The Court warned Mr. Levine repeatedly that he was, and is, required to adhere to the Court's orders. The Court further warned Mr. Levine repeatedly that should he continue blatantly to disregard the Court's rulings, he risked being held in contempt. Mr. Levine failed to heed these warnings and continued in his defiance of the Court. The Court finds that Mr. Levine's conduct obstructed the administration of justice. *See Pennsylvania v. International Union of Operating Engineers*, 552 F.2d 498, 509 (3d Cir.), *cert. denied, Freedman v. Higginbotham*, 434 U.S. 822, 98 S.Ct. 67, 54 L.Ed.2d 79 (1977) ("flouting a trial judge's commands is the essence of obstructing the administration of justice"); *see also Lowery*, 733 F.2d at 445; *In re Gustafon*, 650 F.2d 1017, 1020 (9th Cir.1981).

■ The Court finds that Mr. Levine's conduct was willful. Mr. Levine has many years of experience as a trial attorney, including experience as an Assistant United States Attorney. The Court gave numerous, unequivocal warnings that persistence in his

course of conduct would result in a finding of contempt. Moreover, Mr. Levine should be aware of the well-established obligation of a trial attorney to obey all orders of the Court, even those that he may feel are incorrect. *See Maness v. Meyers*, 419 U.S. 449, 458, 95 S.Ct. 584, 591, 42 L.Ed.2d 574 (1975) ("Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect."). Because Mr. Levine should have been aware that his conduct was wrongful, the Court infers that it was willful.

■ The Court further finds that summary procedures are necessary in this case, in which there are three defendants and ten attorneys.[2] The Court held Mr. Levine in contempt as a last resort; no method short of contempt has been successful thus far. Unless the Court took a significant, immediate step to deter the misconduct of Mr. Levine, this already protracted and extraordinarily unpleasant trial, which is now entering its ninth week, risks becoming unmanageable; the Court concluded that Mr. Levine would continue to defy the Court as long as no sanctions were imposed. This Order is necessary to preserve order and justice in the courtroom, to protect this Court's authority, and to prevent a mistrial.

■ The Court sets forth below specific examples of Mr. Levine's conduct that cumulatively precipitated the finding of criminal contempt. The Court cannot feasibly list every one of the numerous instances of Mr. Levine's misconduct, but instead lists only selected instances from the two weeks of trial immediately preceding the conduct that directly lead to this contempt citation.[3] In

---

1. The Court dispels any notion that its decision is affected by prior proceedings in a separate matter involving defendant Briscoe. The Court does note that in *United States v. Briscoe and Gunter*, Cr. No. 92–85, Mr. Levine, on behalf of defendant Briscoe, did seek and was granted a writ of mandamus against this Court. *See In re Leonard E. Briscoe*, 976 F.2d 1425 (D.C.Cir.1992) (holding that this Court did not have power under Fed.R.Crim.P. 21(b) to transfer that case back to the Southern District of Florida, where the indictment had been returned).

2. Two indictments are consolidated for trial—one returned by the Office of Independent Counsel here in the District of Columbia, and the other returned by the United States Attorney for the Southern District of Florida (with the latter having been transferred here on a written motion filed by Mr. Levine on behalf of defendant Briscoe). Thus, attorney participants are three Associate Independent Counsel, one Assistant United States Attorney (from the Southern District of Florida), and six defense counsel.

3. Selections from the transcript are reprinted as is, without corrections for grammatical and typo-

particular, the Court lists those instances in which Mr. Levine persisted in a course of conduct in defiance of a previous ruling of the Court.

In addition, the Court recites occasions where Mr. Levine has ignored the established rules of this courtroom. During the Court's pretrial conference off the record, the Court set forth its standard courtroom procedures. It instructed the parties, as it does in every case, not to argue objections from the well of the court. The Court believes that, among other reasons, such arguments are more often aimed at influencing the jury, rather than designed for aiding the Court. It also instructed the parties that if the nature of an objection was not apparent from the context, the Court would call counsel to a side bar discussion for an explanation of the objection. *See* Fed.R.Evid. 103. Moreover, the parties were instructed that if they did not understand the basis for an objection or a ruling, or if they wished to be heard on the objection, they could request to approach for an explanation and/or to put their positions on the record. Throughout these proceedings, the Court freely has allowed the parties to put their positions on the record. Nevertheless, as the following excerpts show, Mr. Levine repeatedly failed to follow these procedures.

Because isolated quotations from a transcript can give only a partial view of Mr. Levine's conduct, the Court incorporates the entire record by reference as part of these proceedings.[4] The Court also notes the obvious: a written transcript cannot capture adequately the tone and behavior of Mr. Levine.

## I.

On November 9, during his cross-examination of Mr. Dixon, Mr. Levine made arguments to the jury in the guise of cross-examination, and badgered the witness:

Mr. Levine: So what you did was, you did the simple mathematical calculation. He paid 3 million. He got a loan of 4.2 million. The difference between the two is 1.2 million and he kept the 1.2 million as profit; is that correct, sir?

A: Yes, sir.

Mr. Levine: And that is what you told this jury last week and this week; isn't that correct, sir?

A: Yes, sir.

Mr. Levine: Now, sir, isn't that ridiculous?

Mr. Gelber [AUSA; S.D.Fla.]: Objection.

The Court: The objection—

Mr. Levine: Isn't what you told this jury on its face ridiculous?

Mr. Gelber: Objection, your Honor.

The Court: The objection is sustained.

. . . .

Mr. Levine: So the proposition that he put the difference between the purchase price, $3 million and 4.2 in his pocket is on its face just ridiculous; isn't that true?

Mr. Gelber: Objection, your Honor.

The Court: The objection is sustained.

Mr. Levine: As a matter of fact, you don't know what he did with that $1.2 million, do you? You don't know if he put it into the land; isn't that correct?

A: He didn't put it into the land. I am pretty positive about that.

Mr. Levine: You are pretty positive about that? You are pretty positive about this transaction, aren't you?

Mr. Gelber: Objection your Honor.

The Court: The objection is sustained.

Mr. Gelber: Your Honor, may we go to side bar?

The Court: Yes, sir.

(At the side bar.)

---

graphical errors. However, whenever the name of a participant is set forth for the first time, his or her role is mentioned in brackets.

4. Due to the nature of this Order, the Court necessarily lists instances of egregious misconduct. Thus, in all of the situations recounted, the Court has ruled against Mr. Levine. Although the Court has not always ruled against Mr. Le-

vine (or his co-counsel), such rulings have occurred frequently. The Court feels that this is due not only to the lack of merit of his objections, but also due to a concerted defense strategy. The Court believes that the defense frequently has advanced meritless positions in an effort to portray this Court as ruling too often in favor of the government.

Mr. Gelber: Judge, I don't object so much as to the substance. I objected twice. He asked earlier whether it was ridiculous. I believe you sustained it and then he went back and asked the question. Now he is engaging in banter with the witness. I have no problem with doing valid impeachment, if he has a basis to do it. I object to counsel merely asking questions which are so emotionally charged, argumentative and only are going to be sustained, that he is attempting to argue through the questions which he is continually doing. That is my objection.

Mr. Levine: Your Honor, what the prosecution doesn't know about this loan is, in a word, appalling.

The Court: You haven't attempted to follow up with some degree of rationality and order.

Mr. Levine: I would like to do it my way, not his way. He put this misinformation in front of this jury. I intend to correct it, and if everybody pays attention very quickly they will learn what kind of appalling proposition the government advanced. Right now I'm there.

The Court: Don't argue with the witness. Ask him questions. Develop them in a way that you well know how to develop properly.

Mr. Levine: I do. The question that brought us to side bar was this question. You are pretty positive about this loan, aren't you. I want the answer to that question.

Mr. Gelber: Well, actually, your Honor, that is an incredible question. Pretty positive about what? He is throwing out argumentative things with the question....

... He can talk like a lawyer, not attempt to argue to the jury his questions. He shouldn't have leeway to scream.

The Court: I agree.

Mr. Levine: I will move along quickly, your Honor.

The Court: Without screaming, please.

(Tr. 5910–5915).

## II.

Later that afternoon, Mr. Levine attempted to get an exhibit into evidence through a witness who had stated on the stand that he had never seen the exhibit:

Mr. Levine: I show you what has been marked as Defendant's 27, 28, and 29, Briscoe documents. 27 first. Is that not, sir, the closing statement for a—

Mr. Gelber: Objection, your Honor.

The Court: The objection is sustained.

Mr. Levine: Do you recognize government—excuse me, Briscoe 27 for identification?

A: No, sir, I don't.

Mr. Levine: You have never seen it before?

A: I didn't say that. I just don't recognize it.

Mr. Levine: Take your time and look at it.

. . . .

A: I just don't recall seeing this.

Mr. Levine: Describe it, please.

Mr. Gelber: Objection, your Honor.

Mr. Levine: What is it?

The Court: The objection is sustained.

Mr. Levine: I show you what has been marked as government's number—excuse me Briscoe 28 for identification. What's that called?

A: It is entitled "Closing Agreement."

Mr. Levine: What—who are the parties.

Mr. Gelber: Objection, your Honor.

The Court: The objection is sustained.

Mr. Levine: Look it over. Tell us if you have seen it before.

(Pause.)

Mr. Levine: Do you recognize that, sir?

A: No, sir. I'm sorry. I don't.

Mr. Levine: I show you now what has been marked as Briscoe Exhibit Number 29 for identification. Do you recognize that?

A: I don't recall this as a contract that I have seen. I may have. I just don't recall, sir.

Mr. Levine: You just don't recall. All right. Well, do any of these documents, 27, 28 or 29, Briscoe documents, refresh

your recollection that the purchase price was—

Mr. Gelber: Objection, your Honor.

The Court: Mr. Levine, we will excuse the jury for lunch.

After the break, the Court heard discussion on this issue outside the presence of the jury. The Court ruled that this line of questioning should not be continued.

Mr. Levine: Your Honor .... I would like to complete the cross-examination, at least for the time being, and then make some decisions as to whether or not we would want this witness to be held over or not, and I will just have to make that judgment, at least for Mr. Briscoe, when we complete the cross-examination.

The Court: Well, you say complete the cross-examination. You keep ignoring ... my rulings and the rules of evidence. You keep wanting to get evidence in through your testimony through a witness who hasn't seen documents that you have shown him. If that's your idea of cross-examination that you want to go through, I think we ought to talk about it before we bring the jury back in.

Mr. Levine: Your Honor, I have, I think, a considerable amount of experience—

The Court: There is no question about that which is what surprises me about the number of times this has happened.

Mr. Levine: Your Honor, I think I am following the rules. I surely promise the Court that I endeavor to follow the rules. If my performance is not flawless, I ask for forgiveness. I think that the government has called a series of witnesses who are remarkable for what they do not know....

Now, they draw from these witnesses, with the Court's permission and over our objection, the speculation of these witnesses. What I want to do on cross is to establish that they have no knowledge, but, rather, they are speculating, and I think I can do that, and I think I am doing that within the rule.

....

Now, I know, because I have obtained it from the closing files Briscoe Exhibits 27,

28 and 29 which directly refute this witness' testimony. I know that. I have it in my hand. I've shown it to the Court. I have given copies to the government and I have shown it to the witness. This witness said that this land was sold for $3 million. That is dead wrong. He is either lying or woefully misinformed.

Now, we can dance about the rules any way this Court wants, but the fact is that what this jury has been told is wrong. That's the fact. The closing file belies that testimony, and the government has objected and the Court has sustained the government's objection with us telling the jury a fact that is irrefutable. This land was bought for $4.2 million and the money went to the seller. That is what happened.

The Court: Do you understand you are not a witness in this case, Mr. Levine?

Mr. Levine: Your Honor, I have the documents. This is a witness in the case, and if I were given an opportunity to cross-examine this witness within the rules I could establish that fact....

The Court: What rule are you relying on for your introduction of evidence that the witness doesn't know about it?

Mr. Levine: This is part of Frontier's files, your Honor. This witness put in documents from Frontier's files. This is part of its files.

....

The Court: You did ask the witness if he had seen these, and he said no, and then you have a proper mechanism for introducing this one whenever—

Mr. Levine: Your Honor, I put it to the witness. The witness said no. How have I violated the rule by putting it to the witness and asking him questions about it? You know, what is shocking to me, your Honor, what's shocking and, frankly, appalling is that the government doesn't share my zeal to find out what happened. That's shocking. This is what happened, but they want us all to live myopically and not see what is the truth.

The Court: Evidence comes in one piece at a time, Mr. Levine. You know that. One witness doesn't know everything that hap-

pened in a case. If they did we would have one witness on one side and one witness on the other.

Mr. Levine continued to argue to the Court that his questioning of the witness was proper.

The Court: Well, let's proceed, but I have tried to keep my admonitions and request, Mr. Levine, at the bench, at side bar, and I may have to caution the jury that what you are doing is in contravention of my rulings and I may have to refer this case, do some other action, whether it is contempt or referring it for discipline. We will just see. I don't know, but my rulings seem to be just uniformly violated by you as we go.

Mr. Levine: I regret that your Honor has made that observation. Your Honor, I can tell this Court I have never intended to violate a single ruling or the spirit of that ruling. This case has been made very difficult for us, Your Honor. The government has sought and has obtained all kinds of restrictions on our ability to defend ourselves including the first order just before trial about limitations on issues that were relevant to this defense.

I am trying to discharge my duty to the client as required by the canons, and I am trying to discharge my duty to the Court as its officer.

The Court: There may well be a legitimate difference of opinion with respect to that. We will see what happens, but I would hope that—you are a very experienced trial counsel and I would hope that you would conduct yourself the way you are supposed to.

Mr. Levine continued to question the witness. After approximately 12 transcript pages of questioning, Mr. Levine returned to the documents that the Court had just ruled were inadmissible through this witness.

Mr. Levine: Again, I show you what was marked—

Mr. Gelber: Objection, your Honor.

Mr. Levine: May I finish the question?

The Court: Could we talk for a second, please.

(At the side bar.)

Mr. Levine: I have in front of me Briscoe Exhibits 27, 28, and 29. Does your Honor have a copy of it?

The Court: Yes.

Mr. Levine: 27 shows that at the closing—

Mr. Gelber: Your Honor, if he could speak a little lower. He is very loud, and he tried once to get it in. He is trying again, and I don't want him to get it in through side bar.

Mr. Levine: Maybe Mr. Gelber wants to try the case from both sides of the room. It shows—it shows $4,184,184.98. That is approximately $4.2 million. That is the price for the 22 acres. That is it, and this has attached to it, your Honor,—

The Court: We have covered all this.

Mr. Levine: No, we haven't. . . . Now I am going to ask him if it refreshes his recollection . . . Now, why can't I do that?

. . . .

Mr. Levine: . . . [The document] rebuts the $3 million and the 1.2 in the pocket. It does that, and that is the truth, and anything we do—to keep this from the jury is to hide then from the truth.

The Court: I am not saying that you can't get it before the jury. The witness says he doesn't know about it.

. . . .

The Court: The objection is sustained. Let's move on, Mr. Levine.

Mr. Levine: Has your Honor ruled that I cannot show him the document?

The Court: Yes, sir.

Mr. Levine: That was to authenticate. Now I want to refresh his recollection. That is the linguini issue.[5] Now I want to use it for a different purpose. I want to see if it refreshes his recollection. It is a different purpose. Before I wanted to lay a foundation to get it admitted into evidence. Now I want to refresh his recollection.

---

5. The term "linguini" has become somewhat of an abbreviated and light-hearted way of referring to the device of seeing whether a witness's recollection may be refreshed by reference to a document.

Mr. Gelber: Judge, I have all the same objections I made before. This invites—

Mr. Levine: I won't mention the content of the document.

The Court: Let's just move on.

(Tr. 5919–5958).

### III.

During the afternoon session of November 12, at a side bar, Mr. Levine accused the Court of bias and lack of integrity:

Mr. Levine: ... The government comes up here with a grin, because they are comfortable with what this Court is going to do.

The Court: I truly wish you would stop making statements like that, Mr. Levine. I don't know whether your intention is to seek to make me get cross with you—

Mr. Levine: Of course not.

The Court: —or try to make the record look as though you are being picked on unmercifully. I don't know why you keep making comments like that. I take one evidentiary—make one evidentiary ruling after another. If I happen to think you are right, I rule in your favor. If I happen to think you are wrong, I rule against you.

Mr. Levine: My observation is in close to eight weeks, anything we have brought up, we have lost.

The Court: You have not made very good objections.

Mr. Levine: Nor very good motions, because we have lost every single thing.

The Court: You are perfectly entitled to make a record if you want....

(Tr. 6404–6405).

### IV.

During the morning session of November 13, during Mr. Levine's cross-examination of the government's witness Mr. Kisteneff, the following exchange took place:

Mr. Levine: On Monday afternoon I introduced myself to you; isn't that correct, sir?

A: Yes, sir.

. . . .

Mr. Levine: Now, I encountered you again, did I not, on Tuesday morning, isn't that correct, sir?

A: That is also correct.

Mr. Levine: That occurred when you were coming into the courthouse; isn't that correct?

A: Yes, sir.

Mr. Levine: You were in the company of Mr. Roscoe Howard [Associate Independent Counsel]; isn't that correct?

A: Yes, sir.

Mr. Levine: And I asked you if I could spend 10 minutes with you to discuss this case, do you recall that?

A: Yes, sir.

Ms. Smith [Associate Independent Counsel]: Objection, your Honor.

The Court: Could we talk at the side bar for a moment, please?

(At the side bar.)

Ms. Smith: I find this very irrelevant and he is trying to embarrass this man and the tone of voice concerns me.

Mr. Levine: I have nothing to say to that absurd objection and I would like to move on.

The Court: The objection is sustained.

Mr. Levine: On tone? It is an aggressive tone and designed to be aggressive, and I intend to make this witness feel quite uncomfortable during the next hour of his life.

The Court: The objection is sustained. This is totally irrelevant.

Ms. Rogers [co-counsel for defendant Wilson]: No, no—

Mr. Levine: Please, would you stop—

Mr. Wells [lead counsel for defendant Wilson]: Excuse me, your Honor. He refused to talk to us.... the fact that he refused to talk to us is certainly something that shows bias.

The Court: I am not sure that shows bias at all.... Let's get to the facts of what the case is about.

Defense counsel continued to argue that the witness's failure to talk to them showed bias. The Court reiterated that the objection

was sustained. Mr. Levine continued his questioning.

> Mr. Levine: We never did have that conversation did we, Mr. Kisteneff?
>
> Ms. Smith: Objection, your honor. Can we go to side bar, please?
>
> (At side bar.)
>
> Ms. Smith: Your Honor, you just instructed him not to get into that.
>
> The Court: Yes, maybe you didn't understand me, Mr. Levine.
>
> Mr. Levine: I changed the question, your Honor. It was a different question.
>
> The Court: Well, the first question you asked was on the line that I just basically sustained an objection to. You asked it again—
>
> Mr. Levine: No, I didn't ask it again. I asked a different question.
>
> The Court: Where are you going now?
>
> Mr. Levine: Is the Court going to require me to make a proffer?
>
> The Court: The unfortunate thing I have learned through you, Mr. Levine, is that you seek to testify throughout your cross-examination. You seek to get in evidence that is not properly presented through your questions—
>
> Mr. Levine: This witness said yes.
>
> The Court: I am sorry, please let me—do you interrupt all judges or am I the only one?
>
> Mr. Levine: I apologize for that, your Honor.
>
> The Court: That is the problem I have is that you keep bringing in things that are inappropriate.
>
> Mr. Levine: Your Honor, bias and prejudice are relevant issues for cross-examination.
>
> The Court: Of course they are.
>
> Mr. Levine: We believe, and if this Court would give me a shred of latitude, I would develop bias and prejudice. Cutting us off after a few questions you are not enabling me to develop what is perfectly proper cross-examination.
>
> The Court: Bias and prejudice is perfectly proper, but this does not show bias and prejudice.

> . . . .

> Mr. Gelber: When you sustain the objection, they should stay away from it and I assume he has to get the question to get in another area and he should follow the Court's order. When you tell us not to do something, we are not going to sneak it in. Asking a question he knows is outside the area is something you told them not to do. This happened before and I know it is going to continue and we will continue to abide by the rules, your Honor, but every time we are going to come here and seek the—I don't know what the Court can do actually because apparently—
>
> The Court: As I have told Mr. Levine before, it may be necessary to have a contempt citation.
>
> Mr. Levine: Your Honor, those kind of observations I regard as just chilling the defense. I am doing my best.
>
> The Court: It is not chilling the defense. It is trying to be honest with an attorney who repeatedly has disregard for the Court, repeatedly criticizes the Court, talks contemptuously to the Court and insults the prosecution. There has to be some limit in which an attorney—
>
> Mr. Levine: There are standards and I know the standards—
>
> The Court: I think you do, too, and you should look up to them, but I don't want to get off on this.

(Tr. 6549–6556).

## V.

Later that afternoon, during a discussion about the admissibility of certain newspaper articles, Mr. Levine again accused the Court of bias:

> The Court: I am having trouble, of course, by trying this case with the newspaper articles.
>
> Mr. Levine: Most of the government's case came in through hearsay or through witnesses who were able to testify as to what others told them or other things they have seen. If this were a government putting in a business record, it would come in.

The Court: As usual, Mr. Levine, I don't accept your characterization of the evidentiary rulings that were made in the case.

(Tr. 6612).

## VI.

Later that afternoon, Mr. Levine read from a document that was not in evidence and asked the witness:

Mr. Levine: Isn't it true, sir, you told Mr. Smith that it was irrelevant whether the accusations were true or false? Isn't that true?

A: I haven't read that letter in years, but if you are quoting from a letter, it is true.

Mr. Levine: Isn't it true you said that—you told Mr. Smith that the effect had been through HUD's arbitrary and capricious administration of the UDAG that it was bringing this project to the brink?

A: Is that a quote?

Ms. Smith: Your Honor, I don't know what he is reading from.

. . . .

The Court: Could we have a talk for just a minute, please?

(At the side bar.)

The Court: Yes, sir, what are you reading from?

Mr. Levine: What am I reading from?

The Court: You were the one who was reading.

Mr. Levine: I thought there was an objection.

The Court: She said she doesn't know what you are reading from and we are asking what it is you are reading from.

Mr. Levine: It is the letter that this witness acknowledged he wrote.

Ms. Smith: I just don't believe it is in evidence. I don't recall what you are referring to.

. . . .

The Court: . . . Are you reading from 140?

Mr. Levine: No, no, no.

The Court: Could you help me understand what you are doing?

. . . .

Mr. Levine: . . . [I]t is a letter dated January 19, 1990 to Tony Smith at West Palm Beach, pertains to the Belle Glade project, I can proffer that and it is written by Mr. Kisteneff as president of Kisteneff Capital Corporation, and it is his letter with his proposal with respect to this deal and that is what I was talking about.

The Court: But you are reading from the document that is not in evidence which I gather is your concern.

. . . .

The Court: I don't have the slightest question that he is reading from something which is not in evidence which Mr. Levine has done repeatedly in the case.

Mr. Levine: Your Honor, I am allowed to ask the witness if he said some things and I can either paraphrase them or read them and ask if he said them to Mr. Smith. All I need is a good faith basis to make the inquiry. That is all I need. I have that.

The Court: You certainly can make the inquiry, but I am troubled by, and what the government's concern is, reading from something that is not in evidence when you clearly are just reading it for the record.

Mr. Levine: I am asking the witness if he remembers it. I don't want to put it in front of him right now. . . . I want to show he doesn't know some of these things. I want to do it my way. I don't want to do it Ms. Smith's way. I don't have to do it her way under the rules of evidence. If he says no, then I can confront him with the document. I don't want to show it to him so he says yes.

The Court: If all you are trying to do is trick the witness by reading lengthy statements which he has no—

Mr. Levine: Your Honor, I asked one—these are not lengthy, they are short.

The Court: We are never going to finish this case.

Mr. Levine: I didn't bring us here.

The Court: Please do not read the exhibit. Ask him if he said something. You are certainly entitled to do that. Let's not

read something that is not in evidence to the jury.

(Tr. 6636–6641).

## VII.

Later that afternoon, Mr. Levine concluded his cross-examination of the witness Kisteneff by, in effect, making an improper argument to the jury:

Mr. Levine: [Mr. Briscoe] wasn't going to let HUD force him out, was he, sir?

A: You must ask that to Mr. Briscoe.

Mr. Levine: He had too much pride and too much principle and he didn't care about the money; isn't that true, sir?

Ms. Smith: Objection.

The Court: The objection is sustained.

Mr. Levine: He wanted to build Belle Glade for those people who desperately needed it, didn't he, sir?

Ms. Smith: Objection.

The Court: Mr. Levine, I have said several times, please limit yourself to questions properly phrased.

Mr. Levine: And you wanted the fee and your reputation; isn't that correct, sir?

A: No, sir.

Mr. Levine: And you on the one hand threatened him with criminal prosecution and on the other hand just days later wanted to do business with him; isn't that correct, sir?

Ms. Smith: Objection.

The Court: The objection is sustained.

Mr. Levine: It is pay back time, isn't it, Mr. Kisteneff?

Ms. Smith: Objection.

The Court: That wasn't even a question, as I understand it.

Mr. Levine: It was a question.

The Court: The jury is instructed to disregard it.

(Tr. 6721–6722).

## VIII.

During the morning session of November 16, the Court made the following observations in open court before the jury was brought in:

The Court: Now, I don't know how this case has gotten into the unfortunate atmosphere, for want of a better word, that it has gotten into. The administration of justice counts a great deal on the professionalism, ethical standards, whatever you want to call it, of the lawyers who are before the court. We, frankly, don't have very good mechanism for trying to deal with it when we have time wasted or conduct which is questionable. During the cross-examination by Mr. Levine of Mr. Kisteneff on Friday afternoon, I thought to myself how long is this going to go on, and then I thought well, if past is prologue, what will happen is Mr. Levine will finish his cross-examination and then he will make two "questions," which in effect are mini arguments which he knows to be objectionable, and that is how we will close, and sure enough that is what happened.

. . . .

If anybody thinks I have committed reversible error, that is their thought, but that is not up to either counsel or this court to decide. I think basically there seems to be an atmosphere intended to try to intimidate me to rule in a particular way and I will neither be intimidated nor over react. I am not angered by anything that happens, although I am disappointed by counsel's conduct, I am disappointed by the repeated insults and attacks on government counsel.

We are all here to do a job and this job is not pleasant for any of us. Looks like we are just going to have nothing but problems with this particular witness, but I make, once again, a plea for proper, vigorous, but ethical and professional representation of the parties to this case, and I will direct you, Mr. Levine, when you finish your cross-examination of a witness and are through with your questions, stop. Don't make mini arguments. You will have an opportunity for argument at the close of the case.

(Tr. 6809–6812).

## IX.

During the morning session of November 17, while Mr. Gelber was questioning Ms.

Abbamonte, Mr. Levine attempted to make an argument in open court:

Mr. Gelber: Approximately how much a month did it pay in American Express bills?

Mr. Levine: Objection, your Honor.

The Court: The objection is overruled.

A: I think—

Mr. Levine: Your Honor, what if they are business expenses?

The Court: Could we talk at side bar for just a second, please.

(At the side bar.)

The Court: Yes, sir.

Mr. Levine: Your Honor, Mr. Briscoe, as Mr. Gelber knows and as the Court knows, lives in Fort Worth, Texas. That is his home. . . .

Now, his lodging if he was in a hotel, that would be a business expense. The fact that he is in a condo because he has to be there longer is also a business expense. That Mr. Gelber lets her say that is a personal expense is perverse. It is not true. It is perverse. It is distortion. It is corruptly adduced evidence. It is a fraud on this jury.

. . . .

Your Honor, you may want to abide by this, but to me it makes me sick. It is just not true and they know it. That's my objection.

Mr. Gelber: . . . .

My concern is I am not going to argue from the well of the court. I haven't and I will not. This emotional argument which is projecting in front of the jury is not part of the rules of this courtroom. I am trying to do an examination pursuant to the rules and I will obviously abide by the Court's instruction, but I think it is absolutely unprofessional of Mr. Levine and it is not fair to the government actually for him to do what he is doing.

The Court: I would ask, Mr. Levine, again, direct Mr. Levine, please don't argue from the well of the court. I would be happy if you want to any time put anything you want on the record.

Mr. Levine: Your Honor, there is no requirement, Mr. Gelber knows it, that the disbursements that came from the bank of the trustee which were justified by an invoice had to go to pay that invoice. These are general. They don't have to go to that specific sub. He knows it, and that distinguishes UDAG from others. He knows this. He makes these arguments here. He knows it is not true.

Now, your Honor wouldn't know that because your Honor hasn't been involved with evidence like we have, but he knows it and he knows the regulations, and he does, and that is why these attacks are in part personal because what is happening here, your Honor, is the government is not doing what is required of the government. This is not an honest prosecution. That's the problem here. There is a fraud on this Court. There is a fraud on this jury, and most significantly, there is a fraud on this defendant, and that is all I want to say.

The Court: You have said it ad infinitum.

(Tr. 7021–7024).

## X.

Later that afternoon, Mr. Levine started his cross-examination of the government's witness Ms. Abbamonte. After what was intended to be a lengthy, dramatic pause, Mr. Levine began in a loud and abusive manner as follows:

Mr. Levine: Ms. Abbamonte, tell the ladies and gentlemen of the jury about your psychiatric care.

Mr. Gelber: Objection, your Honor.

A: I beg your pardon?

Mr. Levine: Tell the ladies—

Mr. Gelber: Objection, your Honor.

(At the side bar.)

. . . .

Mr. Levine: We believe we have a good faith basis for asking questions about this woman's psychiatric status.

The Court: Well, of course the federal rules do oblige me to protect the witness from undue harassment. [Fed.R.Evid. 611.] That may well fit within that area. You have said this person is incompetent?

You certainly haven't said anything so far. What are you basing your question on.

Mr. Levine: It goes to her bias, your Honor. Competency standards are somewhat easily met for the witness, so I am not suggesting that this woman is incompetent. I am suggesting, however, your Honor, that she has a bias, that she suffers from a psychiatric condition, that she has been in the care of a psychiatrist, and I would like to probe her on that care, on her diagnosis, and I would like to probe that. She is a very angry lady and she is paranoid. That's the information we have, your Honor.

Mr. Gelber: ... If he has a psychiatric report he can refer to, I certainly would like to see it and I hope the Court would because I feel uncomfortable when a lawyer stands before the witness and starts accusing her of having psychiatric problems without a basis and at this point other than Mr. Levine's belief, I don't think he has provided a basis for a reasonable basis for the inquiry of the area.

Mr. Levine: She has told people when she worked there, she told people there about her conditions. That is how I know it. That is one of the ways I know it.

Mr. Gelber: What conditions are we talking about?

The Court: Help me out. The witness will not be subjected to anything. Harassment is one of the things, and it is my job to protect them.

Mr. Davis [counsel for defendant Steier]: She had mental illness during the time she was doing this?

Mr. Levine: That is my understanding. She discussed with some of other co-workers the mental anguish she suffered at the time she was there.

. . . .

The Court: Some witness, some other employee said she said something is all you have. I will not permit her to be harassed.

Mr. Gelber: Your Honor, could we have a instruction to disregard? I feel it would be appropriate at this point.

The Court: I keep hoping Mr. Levine will cross-examine by asking questions instead of trying to testify.

Mr. Levine: I asked a question, Judge. That is not fair. If you don't want me to go into the area, that is fine, but what I—

The Court: I don't want to play a game with you.

Mr. Levine: I don't like this record to even, by your Honor to be, for that to be said. That's not what I did. I asked the question. If your Honor doesn't like the question I will move on, but I wasn't testifying. As a matter of fact, the question was tell the ladies and gentlemen of the jury about the psychiatric care. Now, that gives the witness the right to—the chance to respond in a narrative. As a matter of fact—

The Court: The question is improper.

Mr. Gelber: Your Honor, I would ask for an instruction.

. . . .

The Court: Well, I don't know quite what to tell the jury, because Mr. Levine will tell me nothing other than she supposedly said something to some employee which is no basis to permit this to be explored.

. . . .

Mr. Gelber: Your Honor, for whatever it is worth, our request would be that the jury be instructed that the question was improper or inappropriate....

. . . .

Mr. Levine: I object to that instruction, your Honor. If there is an objection and you want to sustain it, tell the jury it is sustained. If you wanted them to disregard the question tell them to disregard the question, but do not, I would ask this Court, tell the jury that it was an improper question. I, frankly, don't think it was improper. If your Honor wants me to move on to other areas I will move on.

The Court: I would like you to move on to questions relevant to this case.

Mr. Levine: You say that this witness was irrelevant to this case. This witness was here to smear Mr. Briscoe. I am going to do the best I can with what you give me, but I object to the proposition that the

question was improper. If you want me to move on—

The Court: I think the question definitely was improper. .

Mr. Levine: So you sustain the objection. That's okay.

The Court: I have, and let's try to stay within proper bounds.

Mr. Levine: I will always do that.

The Court: Well, you haven't.

(Tr. 7098–7107).

## XI.

Later that afternoon, during Mr. Levine's continued cross-examination of Ms. Abbamonte, Mr. Levine again disregarded a ruling of the Court. When he thereafter was instructed to comply with the Court's rulings, he questioned the Court's impartiality:

Mr. Levine: But for the filing of that request, HUD just wasn't going to share that information with any of the Briscoe entities; isn't that so?

Mr. Gelber: Objection, your Honor.

The Court: The objection is sustained.

Mr. Levine: HUD sought to keep that information from the Briscoe entities; isn't that true?

Mr. Gelber: Objection. Judge, can we go to the side bar?

The Court: The objection is sustained.

(At the side bar.)

The Court: Yes, sir.

Mr. Gelber: Your Honor, I object not only to this—I object not only to the question the Court has already sustained but that question was simply repetition of the question previous to which you had already sustained, and I mean, I understand that he is trying to make a point to the jury, but he is arguing at this point, and I think asking the subsequent question was nothing more than violating the Court's previous order on the exact same question....

I make an objection to a matter and you sustain it. I suspect that that is because you agree with the position of the government that is no longer an area to go into, and Mr. Levine louder and more emotionally asks the same question in the same area over again. As a matter of fact, he changed it a little bit. He made the part that was objectionable even more apparent. I mean, there has got to be a point when I don't know what to do. I am not sure if I am here asking for sanctions or not. If we are going to get to this point I want to know if he is not able to control himself. I am going to ask the Court to do something because he is asking a lot of objectionable questions. I think the government has a right for him not to do that.

Mr. Levine: Your Honor, apparently Mr. Gelber and the Court have some telepathy going on here. He makes an objection. The Court rules on the objection, and maybe through some air wave that eludes me I don't know the grounds for the objection and I don't know why it is sustained, so I try and change the question to accommodate what at first blush appears to be the reason for the objection. I try and change it to accommodate it.

Now, if I knew the grounds, I would be able to deal with it, but just because an objection is made and the Court sustains, it doesn't mean I have to leave the subject area. I am trying to stay within the subject area.

The Court: You have repeatedly asked the same questions that I have sustained objections to—

Mr. Levine: I disagree.

The Court—as the record will reflect, and there is no mental telepathy.

Mr. Levine: I have no idea what the last objection was, why the objection was made and why it was sustained. I haven't got the foggiest idea.

The Court: That is the most surprising thing I have heard during the course of the trial.

(Tr. 7130–7133).

## XII.

At the beginning of the session on November 18, the Court commented on the proceedings of the previous day:

The Court: ... I will go back to 611, Rule 611 of the Federal Rules of Evidence which I talked about before. It obliges me

to exercise quote "reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1), make the interrogation and presentation effective for the ascertainment of the truth, (2), avoid needless consumption of time, and (3), protect witnesses from harassment or undue embarrassment."

. . . .

Mr. Levine made a series of comments indicating that he didn't have any idea why the objection that I sustained was made or why it was sustained. I found that, frankly, disingenuous, but I would remind the parties of how we have proceeded. I have directed counsel not to argue objections from the well of the court. If I understand, as I told the jury, if I think I understand what the objection is, I will rule on it.

If any party—I mean any counsel at any time is free to request a side bar which we can discuss things in case—because often I will ask for them, as you know, because I don't know the case as well as you do, but I do think that—I do think we are having questions asked which I must confess, I believe Mr. Levine knows are objectionable and that, indeed, I can't believe he doesn't understand why an objection is made to begin with. Mr. Levine, any time you want to put anything on the record, please ask for side bar and I will make sure I understand your position.

. . . .

Mr. Levine: . . . .

If it please your Honor, I want to say this, that during the course of this trial the Court's reprimand and disapprobation has been directed at me. If I am guilty of anything at all it is in discharging my obligations to this client. I have done it with vigor. I believe the Court's disapprobation, the reprimand and in some times it is scorn, chills my ability to discharge my obligation.

. . . .

Your Honor, I am trying very hard. This Court has indulged what I believe to be a prosecution that is not only ill-advised, but corruptly advanced.

The Court: We have heard this speech so many times, Mr. Levine.

Mr. Levine: Well, your Honor, yes, you have. It is true. I am merely trying to meet the statements made on this record by the Court and the effort made by this prosecutor and this prosecution team to seek sanctions against a lawyer who is doing nothing more than trying his hardest. I object to the Court's reprimand. The Court: What in your mind was a reprimand, just so the record is clear.

(Tr. 7163–7169).

## XIII.

Shortly thereafter, Mr. Levine tried to admit Briscoe Exhibit 41 into evidence. The government called for a side bar to object to the exhibit's admissibility on three grounds: that no foundation had been laid, that the exhibit was irrelevant, and that the exhibit fell outside the proper scope of examination.

Mr. Levine: If it please, your Honor, the reason I didn't ask any more questions with respect to the foundation is because I have been told by the Court not to ask questions about the document until it is in evidence, so there are other questions that could be asked, but what the letter does do, your Honor, is it does show that how the Briscoe Company was defending against the audit with this witness' assistance. . . .

. . . .

Mr. Gelber: Your Honor, on a foundation point, Mr. Levine could have said have you seen this document before without telling us what it says. . . .

. . . .

Mr. Levine: Your Honor, we tried to keep the 404(b) audit out. I beseeched this Court many times not to let the government go into the HUD, don't let them call a witness who would speak on it in this court and you overruled my objection. I told you it would be an execution to let it in. The government's position was let them go into it on cross. Now we are in cross and I want to deal with it only in the most marginal way. I have asked the witness about her role in responding. That's all I have asked about, her role in

responding to the audit. She has testified that it was a shortfall. She testified that her own investigation confirmed it. How do I deal with that if I can't ask her questions about it? And now the Court is scorning me again. Your Honor—

The Court: I didn't scold you.

Mr. Levine: Yes, you did.

The Court: You interrupted when I was in the middle of a sentence.

Mr. Levine: I didn't mean to do that. I am sorry.

The Court: All I was saying is that I hope you can keep this witness to what this witness knows. This seems it pretty clearly would be confusing to the jury and goes beyond the scope and is not properly admissible to say nothing of how you are supposed to lead the witness to which this letter should be introduced. The objection is—the letter will not be admitted.

Mr. Levine: May I try and cure the issue of foundation?

The Court: I have great trouble seeing how you are going to cure it.

Mr. Levine: I don't know if I can or not.

The Court: Since it is confusing to be evident to the jury under 403, it seems to be irrelevant. We start out with this—I haven't got time to explain every ruling, Mr. Levine. You understand that.

Mr. Levine: Actually, I don't.

The Court: You are so experienced and you are such a good lawyer. You are acting like you don't know what is going on here.

Mr. Levine: Your Honor, there were three objections raised. One was foundation, one was relevance, one was scope.... The ground for sustaining the objection is fundamental. I need to know what the Court's instruction is....

. . . .

The Court: That is why I referred to 403. The exhibit will not be received.

Mr. Levine resumed questioning the witness and again tried to use Briscoe Exhibit 41:

Mr. Levine: Did you have an opportunity to read Briscoe 41 for identification to yourself?

A: Yes.

Mr. Levine: Does Briscoe 41 contain the data that you supplied in communicating with Dr. Dubose?

Mr. Gelber: Objection, your Honor.

The Court: Could we talk for just a minute, please.

(At the side bar.)

. . . .

The Court: The fact of the situation has not changed. Clearly she provided that information to him. She said she expected him to use it. It doesn't clear the problem of the exhibit. I wish my rulings could—

Mr. Levine: I was trying to cure the problem. I was trying to link the two.

The Court: You interrupted again. I guess maybe some day you won't do that. The objection is sustained.

(Tr. 7174–7183).

### XIV.

Later that morning, Mr. Levine continued to ask improper questions on cross-examination and to discuss the substance of documents not yet in evidence:

Mr. Levine: First of all, you know that Hodges & Son is a minority subcontractor, don't you?

A: I have met Mr. Hodges—it is not Mr. Hodges. It is Doug Long and his partner.

Mr. Levine: These are black subcontractors, aren't they?

A: Yes.

Mr. Levine: And you know that it was Mr. Briscoe's intention to give work to minority subs; isn't that correct?

Mr. Gelber: Objection, your Honor.

The Court: The objection is sustained.

Mr. Levine: And you know that Mr. Long and Hodges & Son didn't have within its organization the ability to administer the contract but it had the fine ability to do the electrical work; isn't that correct?

A: I do not know if they had an administrative capacity at all, no.

Mr. Levine: And you know that the contract with Hodges & Son provided for the Briscoe entities to do the administrative work on the contract, don't you?

A: I would have to read the Hodges contract.

Mr. Levine: You don't have to read the Hodges contract to know that because you could read it from your own letter that you wrote at the time; isn't that true, Ms. Abbamonte?

Mr. Gelber: Your Honor, objection.

The Court: The objection is sustained.

Mr. Levine: I would like it marked.

The Court: Could we talk for just a minute, please.

(At the side bar.)

The Court: Yes, sir.

Mr. Gelber: Your Honor, other than being argumentative, the last ten questions have been only you know, you know, you know attempting to put facts in which most of the time the witness says I don't know anything. It is pure unadulterated argument by counsel....

Every time we raise the issue he does it again, and this isn't the 10th or 20th time. I think we are well beyond that point and I don't know what I can ask the Court to do to prevent Mr. Levine from referring to exhibits that have not been ruled on by this Court as competent evidence before the jury....

Mr. Levine: I have not read one word from that letter, not one.

The Court: You are being extremely argumentative and extremely hostile. I don't know why you persist in this, but I don't know where you are going. I don't know this letter, but, once again, you are referring to a matter that may or may not become an exhibit before it gets in. You know the right way to proceed, Mr. Levine.

....

Mr. Gelber: ... Should I request sanctions of some type, some kind of proceeding, because he is not going to follow the Court's rulings on this obviously.

The Court: The record makes that very clear. I don't know what I will do at the end of the proceeding today or whether I will have to wait until the end of the proceeding before considering sanctions, but so far I have had no success in asking Mr. Levine to proceed properly.

Mr. Gelber: Judge, unfortunately while that may deal with Mr. Levine professionally, it does not—it alters in no way the ability of the government to present the evidence to the jury so that they can make the decision based on the evidence. Respectfully I don't mean to insult the Court's position on this point, but that only deals with Mr. Levine personally and professionally in relationship to the Bar. It doesn't deal with what he does in the courtroom, and I do not know what I can ask the Court to do more than I have already done.

You haven't disagreed with any statement we have made on this matter yet; yet every time we come up here he does it again, and I have never asked any Judge to hold an attorney, even if I believed it was contemptuous, to hold an attorney in contempt, but at this point repeated repetition of the same thing over and over again, and this is not an inexperienced attorney, I am not sure what the Court can do, but I know there are threats of fines, incarceration which will stop an attorney from doing those types of things, and I don't know how I can present the government's case if Mr. Levine continues to flagrantly violate the Rules of Evidence and this Court's direct admonishments.

....

Mr. Davis: ... with respect to this particular instant I don't think there is anything objectionable. He asked for something marked.

The Court: Let's be more specific on that. The minute the witness said something he shouted quite loudly let this be marked as an exhibit or something to that effect. This was not a normal tone of voice. This was in effect seeking, implying by the tone of his voice that the witness was somehow grossly wrong and he was going to clear this up through this exhibit without any idea of my ruling on the exhibits whether

they were admissible on or not. Unfortunately, the transcripts don't reflect the true nature or the true conduct of the case.

Mr. Levine: Your Honor, I disagree with that, totally disagree with that, and to the extent it reflects your views I want it to reflect mine. I disagree. Your Honor, I affirm I have been vigorous but I have been within the rules. The witness said she had to read the contract and I said you didn't have to read the contract because you wrote your own letter about it, and what I wanted to do was to have her letter marked, and this is where we were when Mr. Gelber objected—I didn't go into the content and I didn't raise my voice, but this woman—

The Court: Mr. Levine, that is absolute nonsense.

Mr. Levine: Your Honor, I don't want to quibble. I don't want to—I wanted to try this case. The government has been—

The Court: Lower your voice a little bit, please.

Mr. Levine: Maybe, your Honor—listen, your Honor has gag orders, threatened me with contempt. The government has come up many times asking for sanctions or contempt, and in these side bars you say you don't know if you can wait to see if it has to be done now, it has to be done afterwards. I can't function this way Judge. I can't. If you want to put me in jail, do it now.

The Court: It doesn't seem to bother you in the slightest.

Mr. Levine: It does, your Honor. I can't tell you how it offends my core that a Judge of this Court would think those things of me.

The Court: The record will reflect.

Mr. Levine: I am doing what I think is not only a professional job but a good job, and I am going to follow the rules and I am going to withstand all the allegations made by the government and I am going to withstand the comments made by the Court. I intend to defend this man until this jury finds him innocent. That is what I intend to do.

The Court: We will ask you, Mr. Levine, for about the 55th or hundredth time, will you, please, conduct yourself properly in accordance with the rules as you know them so damn well.

(Tr. 7239–7247).

## XV.

Notwithstanding these clear warnings, Mr. Levine continued to try to put inadmissible evidence before the jury through his cross-examination:

Mr. Levine: So you come here and you testified about these transactions, and you have called these kickbacks, and you never spoke to Mr. Briscoe about them and you never spoke to Mr. Horton about them; isn't that correct?

A: That's true.

Mr. Levine: And at the very time in the file for which you were the record custodian there were checks of which these are just a small representative portion—

Mr. Gelber: Objection, your Honor.

. . . .

(At the side bar.)

Mr. Gelber: Your Honor, so we are very clear as to what this witness has said and what Mr. Levine has just said, this witness was shown $30,000 in checks who said over $300,000 came in. Now there has been not one other piece of document suggesting there are other checks or anything suggesting that $30,000 that is now in evidence is anything more than the total. Not one piece of evidence. Mr. Levine's question, and if it is read back I am quite confident it is in the positive that he used, and this is just a small fraction of it, is nothing more than an attempt on his part to suggest to the jury that there is evidence out there that has not been admitted to the jury and put before the jury, it might be admitted before the Court but it is not before the jury now. It is such flagrant violation of anything the Court has told him to do.

Mr. Levine: You are speaking very loudly, I am being told.

Mr. Gelber: I am sorry. It was an absolute purposeful attempt to put evidence

before this jury that is not part of the record, and that is represented by the documents which are not part of the record and is exactly what he said on a previous occasion, and I think we just talked about this before lunch, and I am absolutely amazed, because it is a critical point.

This witness said this is 30,000. He got 300 [thousand dollars] back. He just said it is a small amount. The witness didn't say that. No documents have said that. The only person who has said that is Mr. Levine to the jury in his question, and it wasn't part of the question.... I do not know what to do any more when it comes to this. I know the Court has contempt-ability.

I know the Court can tell him that not only is it inappropriate but he can be fined or even incarcerated. I think at some point he has to ask his questions and not testify to the jury in absolutely impermissible and contravention of the rules and your prior order.

. . . .

The Court: I don't know whether it is the same person I have known or what. It is the same objection. You persist in asking questions in the same form.

Mr. Levine: Your Honor, do you see what this witness has done? This witness on direct examination said—this witness right here to you in this Court—

The Court: Could you not ask her a small portion? Just ask whether or not it was— I am hearing in part what all the evidence to the jury is doing, and I don't want to mislead you, Mr. Levine. My law clerk is spending this afternoon researching contempt. I thought you could go on with the proceedings and undo what was being done. I don't understand why you keep doing this transgressing in this fashion.

Mr. Levine: Do you think, your Honor, that I really want to be in contempt? I assure you I don't want to be in contempt. Your Honor, please. I am trying so hard. This prosecution is formidable.... This witness is inventing everything.

The Court: You can ask her about that. We are talking about in your question you

are trying to bring before the jury that which is not evidence.

Mr. Levine: Your Honor, this witness has testified that she never saw any advances to Mr. Horton. There are other advances. This is not a game. Mr. Gelber knows that these are in the records. His office has the records.

The Court: The objection is sustained. You know the question is not proper.

Mr. Gelber: Your Honor, Mr. Levine's belief that the witness is being inventive is not a basis for his violation of the rules.

Mr. Levine: I wasn't violating rules.

. . . .

The Court: ... I am not attempting to gag [Mr. Levine]. I feel an obligation to put him on notice, that I am considering after this trial to find him in contempt if this continues. I no longer am thinking in terms of whether. I have to do something after the trial is over. I think it is only fair to let it be known.

(Tr. 7348–7353).

## XVI.

The conduct that directly preceded the contempt citation occurred during the morning session of November 19 when Mr. Levine tried to have proposed Briscoe Exhibit 46 received into evidence. After hearing argument on this document at side bar, the Court ruled that the document was inadmissible under Rule 403. Mr. Levine then continued to argue the document's admissibility:

Mr. Levine: Your Honor, this evidence not only shows, not only part of the proof that he didn't loot it; it comes in to show that she knew it didn't. This very witness.

The Court: We have spent a half hour on this exhibit and I have ruled. How much more do you—

Mr. Levine: Your Honor, as always, I will follow the rulings of the Court. May I make one suggestion? May I offer it, your Honor, if I redact, if I redact everything else in the letter except what it is and the paragraph I have read so it would be the introduction, the paragraph 5A and then the signatures?

Mr. Gelber: We have the same objection, your Honor. Your Honor, we are ready to put the witness on the stand.

Mr. Levine: The government's impatience with our injustice is remarkable. They are ready for sentencing, your Honor.

Mr. Gelber: Your Honor, shall I call the witness?

The Court: Anything else before we resume?

Mr. Levine: Yes. I would like a ruling on the proposal that it be redacted and be admitted in redacted form.

The Court: You are asking me to rule on—you want—I have been given an exhibit which I have concluded is not admissible. Now you want me to sit here and redact it.

Mr. Levine: No. I told you the redaction. I want to redact it and I am moving it into evidence in the redacted form and I have described the redaction....

The Court denied this request. After the side bar was completed and the jury returned, Mr. Levine continued his questioning of the witness, Ms. Abbamonte, and continued to try to admit Briscoe Exhibit 46:

Mr. Levine: You told us yesterday, Ms. Abbamonte, that Mr. Briscoe was entitled to receive personally over $800,000 from Belle Glade; isn't that right?

A: Briscoe Enterprises Limited, the developer, was entitled to receive those funds. I would really hate to say without looking at Belle Glade's documents whether he was entitled to receive them personally.

Mr. Levine: Well, you told us yesterday that you were aware that he was owed over 300—excuse me, over $432,000 for developmental costs that he advanced; isn't that right?

A: I did not say that. I said $432,000 was drawn down on a draw from Belle Glade and was stated for general requirements. Mr. Briscoe at that point did not put $432,000 in the project.

Mr. Levine: He had advanced that money; isn't that true?

A: That's not what I said, Mr. Levine.

Mr. Levine: That is what you said yesterday, isn't it, Ms. Abbamonte?

A: No, that's not what I said.

Mr. Levine: In any event, it was money that he was entitled to and properly booked in Belle Glade; isn't that correct?

A: The developer was entitled to that money. The developer was Briscoe Enterprises Limited.

Mr. Levine: All right. The developer, Briscoe Enterprises Limited, was entitled to $432,000; isn't that right?

A: It was drawn down, that's true. I am going to assume it was appropriate.

Mr. Levine: You have no evidence that it was inappropriate?

A: No.

Mr. Levine: You, in fact, yourself knew it was, in fact, appropriate, isn't that true?

Mr. Gelber: Objection, your Honor. Just asked and answered.

The Court: I think it has been covered.

Mr. Levine: Your Honor, may we go to side bar?

The Court: Yes, sir.

(At the side bar.)

Mr. Levine: Your Honor, the exhibit which we just discussed proves that she knew it, and I want to, again, renew my motion to put it into evidence.... She knew it, and when she says what she just said, she is hedging and I want to use this document.

Mr. Gelber: Your Honor, the witness isn't hedging. My objection was repetition, because she has agreed on I think at least twice, maybe even more than that given the fact he has asked it a few different ways to the point Mr. Levine is making. That is the only reason I am here. I am the same objection to the document being introduced as I raised before. This record is very clear and going to show whatever Mr. Levine's argument is he is not entitled—I mean this witness is not hedging. This witness is saying exactly what she thinks.

Mr. Levine: She just said that she assumed, but she didn't seem to know. This says she knows. She didn't—she said she assumed he was entitled to the transfer

but she wasn't prepared to say that she knew it.

. . . .

. . . I would ask the Court—I don't want to do it—although I knew I was notwithstanding the Court's order based on her new approach to this, her new testimony.

The Court: What is the new approach?

Mr. Levine: Yesterday she conceded that Mr. Briscoe was entitled to the excess of $800,000. Today she just said she assumes it. I want to prove that she knew it. I don't want an assumption. I want to use this, and in the ordinary course I would be able to do it without coming to side bar, but this Court has put me on notice of contempt.

This Court is chilling my ability to cross-examine the witness, so I want to come over in a cautionary way—

The Court: Mr. Levine, I normally don't get through the day without quoting contempt on 42(a). I want to be fair to you. I am trying to be fair.

Mr. Levine: I don't think you are being fair to me. I am trying to defend this case. I have come to side bar because I want to do it with the Court's permission. That's what I have come here for. I have come here to ask the Court's permission and the Court's response to my request for permission is the threat of holding me summarily in contempt. That is, I submit, not right. I would like to get back to the issue in the case, your Honor. I would like to use this document.

The Court: The objection that I have before me is the objection to the question. The objection is sustained.

Mr. Levine: There is no question before the Court. I asked to come to side bar.

The Court: Please do not talk quite so loud. I thought that you asked the question and I thought there was an objection. Am I—

Mr. Gelber: That is exactly right, your Honor. I thought we came here because I had said from the well asked and answered. . . . I have the same objections I have to the document.

Not only have we done it three times today, but Mr. Levine, as he said a moment ago, we did it yesterday too and he is badgering the witness on the same point she has conceded in two different ways.

Mr. Levine: If the government would say she conceded, it would be very simple, your Honor. This is a very simple proposition. I am not trying to be contentious. If the government wants to tell the jury it conceded, that is fine.

The Court: Let's move on, Mr. Levine. There was an objection. I have sustained it.

Questioning of the witness by Mr. Levine continued:

Mr. Levine: In addition to the $432,000 to which Briscoe Enterprises was entitled, I believe you testified yesterday there was another $400,000 to which it was entitled; isn't that correct, and that was in the form of construction overhead?

A: Mr. Levine, I will be happy to tell you that $432,000 of general requirements and $312,000—$312,500 of supervision was drawn from Belle Glade and given to Briscoe Enterprises Limited. It was on a draw. I will not make a certification, a legal judgment, an accounting judgment it was proper. I would be happy to tell you it did do that.

Mr. Levine: Now, your Honor, I would like to come to side bar again.

The Court: All right.

(At the side bar.)

Mr. Levine: Briscoe 46 shows that she did, in fact, at that time make the certification. Her certification. She won't give it to me now. I can prove that she did it then. I would like permission of the Court to do that.

. . . .

Mr. Gelber: I have the same objection. Not only the same objection, but your Honor rules about badgering witnesses about the same subject.

The Court: Right. It is extraordinary.

Mr. Gelber: To the extent you can put things in reference, I as opposing counsel feel obliged to give some leeway, but this isn't putting it in reference. He is arguing

it again in the same way he argued it yesterday which was improper, and now he is trying to put it at issue by arguing with her more and we have done this already. We have gone down this road and he spent a lot more time on cross than I did on direct and it is time that he move on.

Mr. Levine: I am sure they do, because this is painful. This goes right to the heart of their case and they know it and this document proves it and we know the truth and they are here trying to conceal it.

The Court: Let's move forward, please.

(In open court, jury present.)

The Court: Yes, sir. You may proceed.

Mr. Levine: I would like to approach the witness. I show you what has been marked as Briscoe Exhibit 46 for identification.

Mr. Gelber: Objection, your honor.

At the side bar, Mr. Levine asked to use the exhibit to refresh the witness's recollection. The Court denied that request and asked Mr. Levine to move on.

Mr. Levine: So, Ms. Abbamonte, there was 432,000 plus 300 and what?

A: 312,500.

Mr. Levine: 312,500, so that's $750,000 that went to Briscoe Enterprises Limited; is that correct?

A: Yes. 744,500. That's true.

Mr. Levine: $744,500, right?

A: Yes.

Mr. Levine: That went to Briscoe Enterprises Limited in a proper way; isn't that true?

A: Mr. Levine, the money moved. I don't wish to nitpick. I did not do an audit of Belle Glade.

Mr. Levine: But Belle Glade was audited, was it not?

Mr. Gelber: Objection, your Honor.

The Court: We have covered this several times, Mr. Levine.

At that point, Mr. Levine was conducting his cross-examination from the lectern. In a loud, argumentative tone, he then, in open court, added the proverbial straw that broke the camel's back. He stated:

**Mr. Levine: I want to get it straight, your Honor, because the witness is changing the testimony and I want to get it straight.**

Mr. Gelber: Your Honor.

The Court: Let's have side bar conference, please.

(At the side bar.)

The Court: Yes, sir.

Mr. Gelber: Your Honor, I object to the area and I object to another—I am not sure that the court's ruling has been through the course of this trial we are not supposed to argue to the jury anything. Now Mr. Levine takes it upon his self to say to the jury his opinions to contradictions. It is not even a question. It is so improper I am not sure why—well, I think it is—I am not saying more.

Mr. Levine: I will withdraw the remark, your Honor. I will move on.

The Court: I think I have no choice Mr. Levine, but to hold you summarily in contempt. I sentence you to four hours incarceration, beginning at the end of the trial today.[6]

(Unproofread transcript 15–39).

## XVI.

The interplay between Mr. Levine and his client, defendant Briscoe, also deserves mention. When side bar conferences have been conducted while the jury is in the courtroom, all participants have been expected to keep their voices sufficiently low so that they would not be heard by the jury. A considerably smaller number of side bar conferences have been held without the jury's presence in the courtroom—as, for example, when an objection has been made just when a recess normally would be taken and the Court excuses the jury. At the latter type of conference, Mr. Levine has often raised his voice considerably, particularly when expressing his repeated objections to the entire prosecu-

---

**6.** Mr. Levine spent the four hours in the cellblock of the courthouse, joined voluntarily for the entire time by Ms. Metlin and Mr. Clark of his firm, and for part of the time by counsel for defendant Wilson. (That, of course, was with the specific approval of the Court).

tion, so that his client readily could hear his objections.

Defendant Briscoe is or affects to be a volatile person. The record does not reflect adequately defendant Briscoe's conduct in the courtroom. During the trial defendant Briscoe has (1) audibly cursed an Associate Independent Counsel (Mr. Howard), (2) audibly cursed a government witness whom he once employed (Ms. Abbamonte), and (3) been physically restrained on several occasions in a relatively unobtrusive, but still noticeable way by a variety of defense counsel who have cooperatively, and wisely, recognized that outbursts by defendant Briscoe are unlikely to aid the defense case. Mr. Levine's overall conduct during the trial, as was true at the status calls prior to trial, inevitably has fanned the flames of defendant Briscoe's discontent at being a defendant in three indictments. Unfortunately, there is little confidence on the part of the Court that this finding of contempt will prove to be the only one.

### XVII.

It is certified that the above-described conduct, all of which occurred in the actual presence of the Court and was personally seen and heard by the Court, constituted a contempt of court by Barry M. Levine, which contempt seriously and substantially interfered with these proceedings and obstructed the orderly administration of justice.

### ORDER

Pursuant to Rule 42(a) of the Federal Rules of Criminal Procedure, and for the reasons stated in the accompanying Order of Contempt, it hereby is

ORDERED, that Barry M. Levine, counsel for defendant Briscoe, be, as he was orally on November 19, 1992, summarily adjudged in contempt of this Court. It hereby further is

ORDERED, that he is sentenced to incarceration for the four hours already served on that date.

SO ORDERED.